IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:17-CR-176-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| LAFIAMMA DEONTE DIBOH, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion to suppress. (DE 35). Pursuant to 28 U.S.C. § 636(b)(1), United States Magistrate Judge Robert T. Numbers, II, issued memorandum and recommendation ("M&R"), wherein it is recommended that the court deny defendant's motion. (DE 60). Defendant timely filed objections to the M&R, (DE 61), and the government responded. (DE 63). For reasons noted, the court adopts the recommendation in the M&R as its own and denies defendant's motion.

## BACKGROUND

The second superceding indictment, returned June 7, 2017, charges that defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924. Defendant filed the instant motion October 5, 2017, seeking to suppress evidence obtained February 1, 2017, during an encounter with law enforcement that resulted in defendant's arrest. The magistrate judge held evidentiary hearing January 19, 2018, at which the arresting officer, Wesley Lane ("Lane"), testified.

In his motion, defendant argues that Lane conducted a warrantless seizure without consent

or reasonable suspicion of criminal activity and conducted a warrantless search without reasonable suspicion that defendant was armed.

## STATEMENT OF FACTS

The court incorporates herein by reference the statement of facts in the M&R, (see DE 60 at 2–5), where such statement accurately reflects the evidence of record. For ease of reference, the statement of facts is repeated below:

> At around 2:00 a.m. on a night in early February 2017, Lane was in uniform and patrolling the South Park community—which he described as one of Raleigh's most crime-ridden areas—in his marked police vehicle. Tr. at 8:13–14; 9:6–15; 11:4–18. Lane, who has been with the Raleigh Police Department for seven years and patrolled the South Park community for the past five, noticed a group of five to ten individuals standing on the corner of Branch and East Streets. Tr. at 4:12–14; 7:16–18; 11:11–12:1. According to Lane, that particular intersection was the location of an open drug market, often frequented by members of the Black Presidents Gang. Tr. at 4:12–14; 9:17–19.
>
> Lane is familiar with the Black Presidents Gang through his work as a gang liaison for his district, a position he has held since 2012. He testified that they are known for drug distribution, the sale of firearms, and violent crimes, and that many members are aligned with the United Blood Nation. Tr. at 5:5–8, 16–18; 6:5–7, 19–21. Lane has also personally seized both weapons and narcotics from areas where members of the Black Presidents Gang congregate. Tr. at 6:22–25.
>
> As Lane drove toward the group, he noticed one person walk away. Tr. at 12:4–5. Based on his experience, he believed the individual either saw him or was alerted that a police officer was coming down the street. Tr. at 76:23–76:5. The individual walked away at a normal pace, but was heading toward the Brown Birch Apartment Complex. Tr. at 12:6–8.
>
> Lane is also familiar with Brown Birch. Drug trafficking and prostitution have plagued the complex, which is located within the South Park neighborhood, for years. Tr. at 14:1–12. Concerned about keeping the complex safe for the families who reside there, the CEO of the property company that manages the complex asked Lane to help prevent trespassing back in 2016. Tr. at 13:17; 14:7–9. Brown Birch tenants have also requested that Lane address the trespassing issues. Tr. at 14:23–25. Since receiving these requests, Lane has issued both verbal warnings and citations to trespassers. Tr. at 20:8–12.

Lane testified that "No Trespassing" signs have been located throughout the property since at least 2012. Tr. at 15:8–19. One sign is posted at both of the complex's official entrances, and there is usually one sign affixed to each of the four sides of every building. *Id.* At the very least, each building contains one sign, *id.*, although they may be difficult to see at night, tr. at 61:21–23. Lane also testified that the complex is not a reasonable shortcut to any location, explaining that there is a greenway behind the property that is open from dawn to dusk, but accessing it involves walking down a steep hill. Tr. at 20:19–21:1; 22:17–18.

As Lane continued his patrol down several different streets, he saw the individual again; this time he was taking a shortcut into Brown Birch using a worn dirt path. Tr. at 22:23–23:3; 47:11–19. The street was poorly lit, so Lane eventually turned his spotlight on the individual, who looked back at him. Tr. at 23:23–25; 24:15–16. Lane immediately recognized the individual as the defendant, Lafiamma Deonte Diboh, someone he knew to be a validated member of the Black Presidents Gang. Tr. at 7:3–7; 24:1. Diboh's name was specifically mentioned as a gang member at meetings Lane attended. Tr. at 41:19–21. He had also seen Diboh on previous patrols. Tr. at 34:4–8.

Diboh continued to walk away from Lane, so Lane turned off his spotlight, parked, and got out of his patrol car. Tr. at 24:1–4, 18–19. As he left his car, he immediately saw Diboh put his right hand into his right jacket pocket. Tr. at 25:25–26:1–2.

Even though Lane knew that Diboh did not reside at Brown Birch, he asked him if he lived there. Tr. at 25:4–6; 26:6–7. Diboh stopped walking and replied, "no, Lane, you know I don't live here, I'm just cutting through." Tr. at 54:8–9; 26:17–18.

Lane told Diboh that he was trespassing, and asked if Diboh had any weapons. Tr. at 26:22; 27:4–8. Diboh paused for three or four seconds and then, instead of answering orally, shook his head no. Tr. at 27:10–11; 63:18–21.

Based on his training and experience, Diboh's pause and shift to non-verbal communication alerted Lane that Diboh may have a weapon. Tr. at 27:9–23. Lane then decided to frisk Diboh for weapons. Tr. at 27:2–3, 13–20; 28:2–9.

Lane asked Diboh to put his hands on his head. Tr. at 28:12. Diboh began to comply, but as Lane approached, Diboh pushed him away and took off running. Tr. at 28:14–15. A chase ensued, during which both Diboh and Lane fell trying to run up the steep hill. Tr. at 28:16–17, 19–29:4; 74:16–23.

Toward the end of the chase, Diboh pulled a black item from his right jacket pocket and threw it away. Tr. at 29:5–6. The item clattered on the pavement making a "loud metal noise." Tr. at 29:6–8.

3

Lane continued chasing Diboh and eventually apprehended him in a parking area of the complex. Tr. at 29:16–19. Afterwards, Lane went back to where he saw the black item land and found a loaded firearm. Tr. at 29:20–24; 30:4–5.

## DISCUSSION

A.     Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.     Analysis

    1.     Initial Interaction

Defendant objects that the magistrate judge concluded incorrectly that defendant was not seized at Brown Birch for purposes of the Fourth Amendment when Lane, while in uniform and driving a marked patrol car, shined his patrol car spotlight from defendant's rear, (Tr. 23:22–25); parked near defendant's path, (Tr. 24: 2-3); turned off the spotlight, (Tr. 24:18–21); exited the patrol car, (Tr. 24:1–5); and finally, asked defendant "do you live here?" (Tr. 26:6–7).

The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[,]" U.S.

4

Const. amend. IV. "[M]ere police questioning[, however,] does not constitute a seizure." Muehler v. Mena, 544 U.S. 93, 101 (2005); Florida v. Bostick, 501 U.S. 429, 434 (1991) ("[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions.") (citations omitted). Rather, "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." Brendlin v. California, 551 U.S. 249, 254 (2007) (citations omitted). "[A] person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554–55 (1980).

To determine whether a reasonable person would feel free to leave, courts in the Fourth Circuit must consider: "(i) the number of police officers present at the scene; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement; (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine in nature; and (vii) whether, if the officer requested from the defendant some form of official identification, the officer promptly returned it." United States v. Black, 707 F.3d 531, 537–38 (4th Cir. 2013).

In this instance, only one factor, namely, that Lane was in uniform, weighs in favor of finding that a reasonable person would not have felt free to disregard Lane's inquiry and leave the scene. That is, where Lane was the only officer present at the scene, did not display his weapon, did

5

not touch the defendant during initial encounter, questioned defendant in a non-threatening manner, did not inform of suspicion of illegal activity, and did not request any official identification, (see Tr. 23:20–26:7), the Black factors, on balance, weigh in favor of finding that a reasonable person would have felt free to leave. See 707 F.3d at 537–38. Therefore, defendant was not seized within the meaning of the Fourth Amendment during initial encounter with Lane at Brown Birch, and suppression is not warranted on this basis. Mendenhall, 446 U.S. at 554–55.

Defendant argues that the magistrate judge accorded insufficient weight to the fact that Lane used his spotlight at night to illuminate defendant. Defendant cites a decision from the Seventh Circuit, which, in finding that police effected seizure of occupants of a parked car, notes that "the police did more than just stroll up: two squad cars, which bathed the parked car in bright light, implied that the occupants were not free to drive away." United States v. Johnson, 874 F.3d 571, 574 (7th Cir. 2017). In addition, however, the car in question was "parked on a side street in front of a liquor store[,]" id. at 576 and "[o]ne police car drew up parallel to the stopped car, while another drew up behind[,]" id. at 572, blocking the car's path on three sides. See id. Under those circumstances where multiple officers partly surrounded the vehicle, law enforcement's use of spotlights arguably added some indication "that compliance with the officer's request might be compelled[.]" See Black, 707 F.3d at 537–38. However, unlike in Johnson, Lane's use of his spotlight was unaccompanied by other actions or circumstances suggesting the spotlight served any purpose other than to illuminate the dark. Accordingly, presence of a spotlight does not undermine conclusion that defendant's initial encounter with Lane was consensual in this instance.

Defendant's remaining arguments on this issue emphasize that, under the right set of facts, a seizure might occur even if an officer does not "display an intimidating demeanor[,] use coercive

language[,]" brandish a weapon, or physically restrain defendant. United States v. Bowman, 884 F.3d 200, 212 (4th Cir. 2018). However, these arguments are unavailing where the Black factors account for such considerations in the first instance, and, on balance, weigh in the government's favor here. See Black, 707 F.3d at 537–38.

2. The Terry Stop

Next, defendant objects to the magistrate judge's determination that Lane had reasonable suspicion to conduct a Terry stop after Lane asked defendant, "do you live here?" and defendant answered "no, Lane, you know I don't live here, I'm just cutting through." (Tr. 26:17–18).

"The Supreme Court has identified two kinds of personal seizures: (1) brief investigatory stops of the sort identified in Terry v. Ohio, 392 U.S. 1 (1968) [] and (2) arrests." United States v. Johnson, 599 F.3d 339, 344 (4th Cir. 2010). In Terry, the Court held that an officer may, consistent with the Fourth Amendment, conduct a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlaw, 528 U.S. 119, 123 (2000) (citation omitted). "Reasonable suspicion" is not reducible to any set of bright line rules; rather, its existence depends on the "totality of the circumstances, including information known to the officers and any reasonable inferences to be drawn at the time of the stop." United States v. Sokolow, 490 U.S. 1, 8 (1989). "[A] reasonable suspicion need not rule out all innocent explanations; it need only be a suspicion, albeit a reasonable one." United States v. Black, 525 F.3d 359, 365 (4th Cir. 2008). In this manner, "the Terry reasonable suspicion standard is a commonsensical proposition" and courts should "credit the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Foreman, 369 F.3d 776, 787 (4th Cir. 2004).

In this case, Lane observed defendant walking at Brown Birch, a private complex where "no

7

trespassing" signs were posted. (Tr. 15:10–19). Additionally, based upon defendant's voluntary admission, Lane knew that defendant was not a resident at the complex. (Tr. 26:17–18). These facts, taken together, establish reasonable suspicion of trespass.

Defendant argues that because it was dark at the time, Lane lacked a basis to conclude that defendant saw the "no trespassing" signs posted at Brown Birch, which fact, under North Carolina law, may negate liability for criminal trespass. See N.C. Gen. Stat. § 14–159.13(a)(2) ("A person commits the offense of second degree trespass if, without authorization, he enters or remains on premises of another: . . .(2) That are posted, in a manner reasonably likely to come to the attention of intruders, with notice not to enter the premises.") (emphasis added). These argument fail, however, because "a reasonable suspicion need not rule out all innocent explanations[.]" Black, 525 F.3d at 365. Under a "commonsensical" view of the circumstances, see Foreman, 3697 F.3d at 787, where, as here, a non-resident individual is present at a private residential complex where "no trespassing" signs are posted, suspicion that the individual is trespassing is reasonable, even if those facts, standing alone, do not constitute proof that a criminal trespass has occurred. See Black, 525 F.3d at 365. Therefore, a brief Terry stop to investigate such suspicion does not violate the Fourth Amendment. Wardlaw, 528 U.S. at 123.

Defendant further argues that, to Lane's knowledge, defendant might have been on his way visit someone at Brown Birch. This argument fails for two reasons. First, as noted above, "a reasonable suspicion need not rule out all innocent explanations[.]" Black, 525 F.3d at 365. The fact that defendant might have a justification for his presence at Brown Birch does not undermine Lane's reasonable suspicion that a trespass has occurred. See id. Second, defendant told Lane that he was "just cutting through." (Tr. 26:18). That statement negates any speculation that defendant

8

was visiting someone at Brown Birch.

Additionally, defendant notes several factual distinctions between the facts of this case and those of United States v. Bumpers, wherein the Fourth Circuit held that law enforcement had reasonable suspicion that a defendant was trespassing at the time of a Terry stop. 705 F.3d 168, 169 (4th Cir. 2013). In particular, defendant notes that, in Bumpers, officers stopped defendant in a high crime area, on commercial property, where "no trespassing" signs were posted, and officers observed the defendant loitering for at least 10 seconds before commencing their approach. However, these factual distinctions are insignificant. The evidence of record indicates that Brown Birch is also located in a high crime area, (Tr. 9:6–7), and that "no trespassing" signs were posted. (Tr. 15:14–15). Moreover, the fact that Lane observed defendant walking through Brown Birch, rather than "loitering," is irrelevant where one who merely "enters . . . premises of another" may be guilty of trespass. See N.C. Gen. Stat. § 14–159.13 (emphasis added). Therefore, where defendant admitted that he neither resided at Brown Birch nor was visiting anyone, Lane had reasonable suspicion of trespass. See id.

3.      The Terry Frisk

Finally, defendant objects to the magistrate judge's determination that Lane had reasonable suspicion to conduct a Terry frisk where defendant reached into his right pocket after Lane exited his patrol car, (Tr. 25:25–26:2), and where, after Lane asked defendant if he had a gun or any weapons, defendant paused for three or four seconds and shook his head, indicating "no." (Tr. 27:10–11, 63:21).[1]

---

[1] The M&R notes that the government waived argument that reasonable suspicion was unnecessary where defendant ran before Lane could accomplish any frisk. (DE 60 at 11 n.2). Therefore, the court assumes without deciding that reasonable suspicion is necessary to attempt to frisk an individual for weapons, even if no frisk occurs.

9

The Fourth Amendment permits an officer to "conduct a carefully limited search of the outer clothing" of a person, a procedure known as a Terry frisk, without a warrant when the officer has a reasonable suspicion that the person is armed. Terry, 392 U.S. at 27, 30; United States v. Robinson, 846 F.3d 694, 700 (4th Cir. 2017). "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. As in the context of Terry stops, "[j]udicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008). This is an objective inquiry, and measures what an officer knew before conducting the frisk. United States v. Powell, 666 F.3d 1880, 186 (4th Cir. 2011) (citations omitted). Moreover, "it is entirely appropriate for courts to credit the practical experience of officers," as actions that may appear entirely innocent in some contexts may signal the existence of criminal activity in others. Branch, 537 F.3d at 336–37 (citations omitted).

In the instant matter, a number of factors gave rise to reasonable suspicion that defendant was armed. In particular, the fact that defendant reached for his right pocket immediately when Lane exited his patrol car, (Tr. 25:25–26:2), prompted reasonable suspicion that defendant's pocket might contain a weapon. See United States v. George, 732 F.3d 296, 299 (4th Cir. 2013) ("A suspect's suspicious movements can [] be taken to suggest that the suspect may have a weapon."). Moreover, this conclusion is bolstered by evidence that the encounter occurred at night, (Tr. 11:18), in a high crime area, (Tr. 9:6–16), and that Lane knew of defendant's membership in a gang known

for violence and carrying weapons. (Tr. 6:19–22). The Fourth Circuit has considered each of the foregoing circumstances as a factor weighing in favor of determination that the standard of reasonable suspicion was met. See United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) ("[A]n area's propensity toward criminal activity is something that an officer may consider . . . . The lateness of the hour is another fact that may raise the level of suspicion."); Powell, 666 F.3d at 188 ("[A] person's possible involvement in prior criminal activity . . . can be relevant in establishing reasonable suspicion."); United States v. Holmes, 376 F.3d 270, 278 (4th Cir. 2007) (recognizing that membership in a gang known to be armed contributed to reasonable suspicion). In addition, where defendant paused for three or four seconds before denying possessing a weapon and switched to non-verbal communication, Lane, in light of his prior experience, took those behaviors and signs of deception. (Tr. 27: 13–20). Accordingly, viewing the "totality of the circumstances[,]" Sokolow, 490 U.S. at 8, with proper regard for Lane's "practical experience" with encounters of this nature, Branch, 537 F.3d at 336–37, the evidence discloses that Lane had reasonable suspicion sufficient to justify a Terry frisk.

Defendant argues that his three or four second pause before denying that he was armed does not constitute "unusually nervous behavior" sufficient to support reasonable suspicion. Mayo, 361 F.3d at 808. Defendant cites the Fourth Circuit's decision in United States v. Slocumb for the proposition that unusually nervous behavior, distinguished from ordinary nervous behavior, is a necessary condition for reasonable suspicion. 804 F.3d 667, 863 (4th Cir. 2015). This argument fails, however, because the Fourth Circuit observed in Slocumb that while "more 'extreme' or unusual nervousness or acts of evasion" may constitute a sufficient basis for reasonable suspicion, such conduct is not necessary where lesser displays of nervous behavior "may be apprised with

11

other[ acts] in deciding whether suspicion reaches the threshold of reasonableness." Id. As held above, Lane's reasonable suspicion arose from, not only defendant's three or four second pause, but also from defendant's reaching for his pocket when Lane exited his patrol car, the setting in a high-crime area at night, Lane's knowledge of defendant's membership in a gang known for carrying weapons, and defendant's switch to non-verbal communication. Together, these facts support reasonable suspicion that defendant was armed despite absence of unusually nervous behavior.

In sum, defendant's motion to suppress is denied because defendant's initial encounter with Lane was consensual, and, as events unfolded, Lane acquired reasonable suspicion to justify a Terry stop and a Terry frisk before attempting to commencing those procedures.

## CONCLUSION

For reasons noted, defendant's motion to suppress, (DE 35) is DENIED.

SO ORDERED, this the 4th day of June, 2018.

LOUISE W. FLANAGAN
United States District Judge